IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| MARY MA, | ) |
| | ) |
| Plaintiff, | ) Case No. 1:13-cv-89 |
| | ) |
| v. | ) |
| | ) |
| AMERICAN ELECTRIC POWER, INC., | ) JURY DEMAND |
| a corporation; MICHAEL H. CARLSON, | ) |
| an individual; and RANDY F. EBRIGHT, | ) |
| an individual, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## COMPLAINT

Plaintiff Mary Ma ("Plaintiff" or "Ms. Ma"), for her Complaint against American Electric Power, Inc., ("American Electric Power"), Michael H. Carlson, and Randy F. Ebright, states as follows:

## INTRODUCTION

1.  Mary Ma worked for 11 years as a dedicated and exemplary employee at American Electric Power, Donald C. Cook Nuclear Plant in Bridgman, Michigan. American Electric Power is one of the nation's largest generators of electricity, owning nearly 38,000 megawatts of generating capacity throughout the United States. Ms. Ma started working at American Electric Power as a Principal Nuclear Specialist and was promoted to the Engineering Supervisor of the Nuclear Safety Analysis Group. Ms. Ma had the important responsibility of managing the facility's safety analyses and overseeing safety analysis engineers. Ms. Ma was directly involved in safety analyses concerning radiological-consequence accidents, hazardous-chemical consequence accidents, high-energy line-break accidents and loss of coolant accidents

("LOCA"), governed by 10 C.F.R. 50.46 and other Nuclear Regulatory Commission ("Commission") regulations. These analyses are crucial to the safe operation of nuclear power plants and to preventing incidents on a scale of the recent Fukushima disaster.

2. In 11 years of high quality service, Ms. Ma held a variety of engineering and supervisory positions at American Electric Power, received positive performance evaluations, was presented numerous awards, and was even awarded the Corporate Key Contributor award for performance above and beyond the call of duty in leading a project that corrected offsite and control room dose accident analyses.

3. In 2004, Ms. Ma identified certain safety analyses at the company that were unsafe and could result in grave consequences to public health and safety. The employees who were responsible through their errors for the unsafe conditions resented Ms. Ma for raising the safety concerns. From that point on, these individuals retaliated against Ms. Ma by making false statements about Ms. Ma outside her presence. Fortunately, others at the company affirmed Ms. Ma's suggestions for correcting unsafe conditions and refused to permit any disciplinary action to be taken against her.

4. In 2010, that changed, as some of Ms. Ma's new superiors began abetting and engaging in retaliation against Ms. Ma. Mike Carlson, the Site Support Services Vice President, and Randy Ebright, the Engineering Director, who were three and two levels above Ms. Ma, respectively, began overriding Ms. Ma's direct supervisor, Yu Shen, the Nuclear Risk Management Manger, as it concerned the supervision of Ms. Ma. Mr. Carlson and Mr. Ebright insisted that Mr. Ebright prepare Ms. Ma's 2010 performance evaluation in place of her direct supervisor Mr. Shen because Mr. Shen refused to give Ms. Ma a falsely negative performance review. Mr. Carlson's and Mr. Ebright's conduct was unprecedented and contrary to the normal

practices of American Electric Power. Mr. Carlson and Mr. Ebright took these actions specifically for the purpose of disciplining her for raising nuclear safety concerns.

5. During the next 6 months Mr. Carlson and Mr. Ebright permitted employees who were responsible for unsafe conditions to usurp her authority, disregard her safety concerns, make knowingly false allegations against her, and eventually caused American Electric Power to terminate Ms. Ma's employment. Ms. Ma was terminated because she voiced her concerns about safety issues to the company and refused to sign off on reports to government regulatory agencies that she believed were false and intended to conceal serious unsafe conditions at the plant. In fact, Ms. Ma's employment was terminated just one day after a large break LOCA safety analysis that she refused to sign was submitted to the Commission.

## THE PARTIES

6. Mary Ma is a citizen of the United States, the State of Michigan, and a former employee of American Electric Power, Inc.

7. American Electric Power, Inc., is a corporation headquartered in Columbus, Ohio. American Electric Power is an employer under Section 211 of the Energy Reorganization Act, 42 U.S.C. § 5851(a), as a licensee of the Commission.

8. Michael H. Carlson is a citizen of Michigan and an employee of American Electric Power.

9. Randy F. Ebright is a citizen of Indiana and an employee of American Electric Power.

## JURISDICTION AND VENUE

10.     Jurisdiction in this matter lies pursuant to 28 U.S.C. § 1331, as Count I arises under federal law under Section 211 of the Energy Reorganization Act, 42 U.S.C. § 5851. This Court has supplemental jurisdiction over Counts II and III under 28 U.S.C. § 1367.

11.     Ms. Ma filed a timely complaint with the United States Department of Labor, Occupational Health and Safety Administration, Claim No. 5-2700-12-005, against American Electric Power on December 14, 2011, within 180 days after the wrongful termination and retaliation occurred, as required by 42 U.S.C. § 5851(b)(1).

12.     Over one year has passed since the filing of the complaint with the Department of Labor, the delay being in no part due to any bad faith on the part of the complainant, giving this Court *de novo* jurisdiction over this matter pursuant to 42 U.S.C. § 5851(b)(4).

13.     On December 18, 2012, Ms. Ma notified the Department of Labor that because over one year had passed since the filing of the compliant, she intended to file suit in federal district court pursuant to 42 U.S.C. § 5851(b)(4) and 29 C.F.R. § 24.114(a), so the complaint was accordingly dismissed by letter dated December 26, 2012, and received December 27, 2012.

14.     This action properly lies in the Western District of Michigan, Southern Division, pursuant to 28 U.S.C. § 1391(b), in that Ms. Ma performed her employment duties exclusively within this judicial district, the claim arose in this judicial district, and many of the relevant witness are located in Michigan.

## FACTS

**Since 2004, Ms. Ma faced continual ridicule, harassment, and retaliation for adhering to Commission regulations, including letters of warning, leading to her eventual termination.**

15.     As early as 2004, Ms. Ma began facing ridicule, harassment, and retaliation when she began initiating a series of condition reports, which identify issues that needed to be

4

addressed within the corrective action program of American Electric Power. The corrective action program is a program used within American Electric Power to self-correct errors and violations of the Commission's regulations. By initiating those condition reports, Ms. Ma was identifying unsafe practices at American Electric Power, and those responsible for the unsafe practices were upset about Ms. Ma pointing out their errors and reporting the unsafe conditions.

16.     The retaliation against Ms. Ma started to come to a head in 2010. Specifically, on May 5, 2010, Ms. Ma initiated a condition report in the corrective action program to identify that the Nuclear Engineering Department had intentionally provided incomplete and inaccurate information to the Commission on March 30, 2009 that materially affected the Commission's decision-making process in relation to a small break LOCA safety analysis. This small break LOCA safety analysis involved analysis of plant safety in the event of certain postulated accidents. Ms. Ma initiated the condition report in response to what she believed was intentional and illegal misconduct.

17.     Ms. Ma initiated this condition report in the small break LOCA safety analysis because she believed that there were significant errors within the Nuclear Engineering Department's analysis. Ms. Ma identified that if the errors were corrected without making any other changes to the safety analysis, the safety analysis would show that the consequences following a postulated small break LOCA would well exceed 10 C.F.R. 50.46 acceptance criteria for fuel melt. This in turn could potentially result in excessive radioactivity releases to the public.

18.     Ms. Ma believed that the Nuclear Engineering Department intentionally submitted their safety analysis for a small break LOCA to the Commission with errors in violation of: (1) 10 C.F.R. 50.46, for acceptance criteria for emergency core cooling systems; (2) 10 C.F.R. 50.9, for incomplete and inaccurate information sent to the Commission, and; (3) 10 C.F.R. 50.5,

for deliberate misconduct on the part of the Nuclear Engineering Department.  Ms. Ma informed American Electric Power of these violations in several emails, conversations, and condition reports, including sending this documentation to Mr. Carlson, Mr. Ebright, Mr. Bellville, the Nuclear Engineering Department Manager, and Mr. Shen.

19.     Upon receiving the condition report described in paragraph 16 above, the Nuclear Engineering Department refused to acknowledge that they had made any mistakes in their safety analyses.  Upon a concurrence review from the Nuclear Regulatory Affairs Department, the Nuclear Engineering Department conceded to one of the violations within Ms. Ma's condition report. However, after conceding to the violation in September 2010, Greg Hill, an engineer associated with the Nuclear Engineering Department, created a corrective action without obtaining the concurrence of Mr. Shen, Ms. Ma, or anyone else within the Nuclear Risk Management Department, in violation of established procedures.  Ms. Ma informed Mr. Hill that this corrective action was unacceptable, and that this violated established procedures.

20.     Mr. Ebright issued Ms. Ma a letter of warning on January 28, 2011, detailing four specific situations in which he deemed Ms. Ma's behavior unacceptable behavior with respect to communicating and interacting with other members of station staff who have differing opinions or ideas. Mr. Ebright knew that Mr. Hill and the Nuclear Engineering Department were found to have made errors in their small break LOCA safety analyses that violated Commission regulations and that Ms. Ma's conduct was simply identifying these errors and ensuring the safety of the public, and therefore knew that the statements in the letter were false.

21.     In October 2010, Ms. Ma initiated another condition report in the corrective action program to fix and identify other nuclear safety concerns and Commission violations associated with small break LOCA safety analyses.  On the same day that Ms. Ma initiated the

condition report, Keith Steinmetz, Supervisor of the Nuclear Fuels Group, retaliated against Ms. Ma by reacting in a verbally abusive way. Mr. Steinmetz, who was one of the employees in the Nuclear Engineering Department responsible for errors associated with small break LOCA safety analyses, was hostile towards Ms. Ma and told her she was being unprofessional in creating a new condition report. Shortly thereafter, a formal Employee Concerns Program investigation was performed in which the Employee Concerns Manager agreed with Ms. Ma, confirming that the retaliatory behavior against her was motivated by her initiating a new condition report identifying Commission violations.

22. In November and December 2010, Ms. Ma prepared, and Mr. Shen approved, the condition evaluations for the September and October 2010 condition reports that proved the validity of Ms. Ma's nuclear safety concerns about small break LOCA safety analyses. Nevertheless, in the January 28, 2011 letter of warning from Mr. Ebright, Ms. Ma was accused of making false accusations and failing to properly communicate with station staff who have differing professional opinions. These statements were untrue. Ms. Ma had communicated her concerns about safety issues in a professional manner as she had done in the 11 years before. Mr. Ebright knew or should have known the statements were false.

23. American Electric Power was persistent in its efforts to quiet Ms. Ma from reporting Commission violations. On January 28, 2011, American Electric Power revoked her rights to unescorted access within the building, took away her security badge, and sent her to a counselor. There was no justifiable reason for these actions, and Mr. Ebright knew when recommending these actions that they were not justified. American Electric Power was trying to blame Ms. Ma for communication breakdowns as a pre-textual basis to remove Ms. Ma for reporting Commission regulations, either within American Electric Power via self-reporting

condition reports, or directly to the Commission. Due to Ms. Ma's extensive knowledge and experience in safety analyses, she was known for raising the most significant nuclear safety concerns and was singled out for this reason. Other engineers and engineering supervisors who raised nuclear safety concerns at a lesser frequency or lesser level of severity as those raised by Ms. Ma were not subjected to similar treatment.

24. On January 28, 2011, Ms. Ma was unjustifiably referred to the Employee Assistance Program to see a qualified counselor at the Lakeland Employee Assistance Program. The counselor decided she should see Dr. Sulier, a qualified psychologist at Psychology Associates in St. Joseph, Michigan. Ms. Ma met with Dr. Sulier on January 31, 2011. Upon examination, Dr. Sulier stated that he believed Ms. Ma should return to work, and should have her unescorted access and security badge restored.

25. Ms. Ma returned to American Electric Power on February 10, 2011, and that same day she received a second letter about purported performance deficiencies associated with a lack of professionalism and behavior issues. As with the January 28, 2011 warning letter, the letter was based on knowingly false allegations and was improperly motivated by American Electric Power's objective of deterring Ms. Ma from making further safety complaints. Other engineers, engineering supervisors and engineering managers who did not raise nuclear safety concerns similar to those raised by Ms. Ma were not similarly criticized. Ms. Ma, as the primary person responsible for safety analyses under new leadership, was again singled out to receive increased discipline in order to deter her from both investigating and informing American Electric Power personnel of Commission violations.

**Shortly after exposing violations of several Commission regulations and refusing to sign off or actively participate in a solution sent to the Commission for a large break loss-of-coolant-accident (LOCA) safety analysis, Ms. Ma was terminated from American Electric Power.**

26. On March 19, 2009, American Electric Power submitted a new large break LOCA safety analysis to the Commission. American Electric Power submitted the new safety analysis, as part of the Best Estimate LOCA Analysis/Implementation project, to the Commission for review and approval.

27. In April 2010, Ms. Ma, as the supervisor of the Nuclear Safety Analysis Group, took over this safety analysis project, which was pending before the Commission.

28. In August 2010, while the safety analysis was still under Commission review, Westinghouse, a private contractor also working on the project, discovered two large errors in the analysis. Because correcting one part of the analysis would have an extraordinary impact on the analysis as a whole, another portion of the analysis would have to be changed to achieve acceptable results that complied with 10 C.F.R. 50.46, the Commission regulation for acceptance criteria to prevent fuel melt. In other words, a revised LOCA safety analysis would need to be constructed in order to fix the two errors in the previous analysis and comply with Commission regulations.

29. In November 2010, Ms. Ma, her team, and contractors from Westinghouse identified and completed a solution that they determined would be viable. The solution was to modify the safety analysis to correct the two different errors and to change an underlying assumption in the analysis in order to offset the effect of the two errors. This solution was the only viable solution that would allow the Commission to complete a review of the safety analysis within the two year due date. Any other solution to the analysis would require a significant plant

9

modification to comply with Commission regulations and could not be completed before the due date.

30. In November 2010, Mr. Hill initiated a condition report in the corrective action program to question the newly revised safety analysis solution developed by Ms. Ma and her team. In December 2010, Ms. Ma prepared, and another engineering supervisor approved, a condition evaluation that proved Ms. Ma's solution was correct and that Mr. Hill's assertion was incorrect.

31. In February 2011, despite Ms. Ma's revised safety analysis being ready for Commission review, Mr. Hill again raised informal concerns and prevented Ms. Ma's revised solution from being sent to the Commission. Instead, Mr. Hill, Mr. Jeb Kingseed, a contract engineer who supplemented Mr. Hill, and Mr. Bellville, with the approval of Mr. Ebright, managed to have an explanation of an alternate solution sent to the Commission on February 24, 2011. This February 24, 2011 letter to the Commission was intended to inform the Commission of the solution proposed by American Electric Power to correct the two errors found by Westinghouse. This letter was submitted to the Commission without Ms. Ma's knowledge, despite her position of responsibility and authority over all safety analyses.

32. In March 2011, Ms. Ma informed Mr. Carlson, Mr. Ebright, and Mr. Bellville that the February 24, 2011 alternate solution advanced by Mr. Hill and Mr. Kingseed violated Commission regulations.

33. Additionally, the Design Engineering Department agreed with Ms. Ma's solution, as well as her team's and Westinghouse's position on the single failure assumption, and they disagreed with Mr. Hill's and Mr. Kingseed's proposed alternate solution that had already been

sent to the Commission. Nevertheless, Ms. Ma's completed solution was never sent to the Commission or in any way implemented by American Electric Power.

34. After repeated conversations, Mr. Hill and Mr. Kingseed eventually conceded that the February 2011 alternate solution presented to the Commission was not viable. However, incomplete, inaccurate, and rushed information that was not verified by Ms. Ma, her team, Westinghouse, the Design Engineering Department, nor any other American Electric Power engineering group had already been sent to the Commission.

35. Also in February 2011, Mr. Shen left the company and Mr. Ebright named Mr. Bellville as Ms. Ma's new manager. In April 2011, Mr. Bellville directed Ms. Ma to lead a team of engineers that included Andy Hawk, Mr. Hill, and Mr. Kingseed to identify a new alternate solution to provide to the Commission to solve the two large errors found by Westinghouse.

36. Mr. Shen originally argued for incorporation of Ms. Ma's original completed solution. However, Mr. Hill, Mr. Kingseed and Mr. Bellville persisted in their refusal to consider Ms. Ma's completed solution, while at the same time failing to provide justifiable or referenceable reasons why the solution was not being considered. They continued to undermine Ms. Ma and the Nuclear Safety Analysis group, which had the important responsibility and authority over all safety analyses. Additionally, they continually rejected any suggestions that Ms. Ma or Mr. Hawk had regarding other viable, longer term solutions.

37. In May 2011, Mr. Hill and Mr. Kingseed identified and selected a second alternate solution without the input or agreement of Ms. Ma or Mr. Hawk. They developed a solution to revise the safety analysis that corrected the errors by, among other things, cross-connecting the essential service water systems of the two reactor units, thus making each unit

dependent on the other, and preventing the automatic start up of a containment spray pump under certain circumstances. This solution was to be undertaken without a plant modification.

38.	Ms. Ma, Mr. Hawk, and several other engineers and engineering supervisors immediately found that this second alternate solution advanced by Mr. Hill and Mr. Kingseed was not viable, and that it violated many Commission regulations. Ms. Ma told engineers throughout American Electric Power that the new alternate solution should not be sent to the Commission because it violated several Commission regulations and violated public health and safety.

39.	Ms. Ma informed American Electric Power personnel that the second alternate solution was unsafe because it degraded the essential service water and containment spray systems, which could cause severe nuclear safety issues by potentially releasing radioactivity. This could result in excessive fuel melt and excessive radiological consequences to the public that could severely harm public health and safety. Ms. Ma memorialized her arguments against this alternate solution in several emails, conversations, and reports to all influential and high ranking members of American Electric Power, including Mr. Carlson, Mr. Ebright, Mr. Bellville, and Shane Lies, the Plant Manager.

40.	After several meetings chaired by Mr. Carlson in May and June 2011, Mr. Carlson made the final decision to proceed with the second alternate solution. On June 16, 2011, American Electric Power provided the Commission a second resolution, which had not been completed, for addressing the two errors in the large break LOCA safety analysis. The resolution was in the form of a letter to the Commission and presented the second alternate solution advocated by Mr. Hill and Mr. Kingseed that Ms. Ma believed was unsafe and in violation of applicable regulations.

41. Ms. Ma refused to sign the June 16, 2011 letter to the Commission that endorsed this non-viable and uncompleted solution, which she believed violated applicable regulations, and the very next day, June 17, 2011, she was terminated from American Electric Power for refusing to participate in this alternate solution. On June 16, 2011, Ms. Ma had memorialized her concerns that safety issues were being disregarded in an email to Mr. Lies.

42. Bill Mammoser, the Mechanical Design Engineering Supervisor, also refused to sign the June 16, 2011 letter that was sent to the Commission, as did Mr. Hawk. No one within the Nuclear Safety Analysis Group signed off on the letter to the Commission regarding the alternate solution, despite their important responsibility for all safety analyses.

43. In a June 16, 2011 email to Mr. Lies, and prior thereto, Ms. Ma informed American Electric Power that their analysis was incomplete and violated several Commission regulations. Ms. Ma informed American Electric Power that they sent the Commission inaccurate, incomplete, and flawed information regarding the revised safety analysis in violation of 10 C.F.R. 50.9. Ms. Ma informed American Electric Power that the alternate solution created by Mr. Hill and Mr. Kingseed violated 10 C.F.R. 50.46 concerning proper performance of a LOCA safety analysis, as well as several other nuclear safety regulations under 10 C.F.R. 50.

44. Ms. Ma sent email correspondence and reports to Mr. Carlson, Mr. Ebright, Mr. Bellville, and Mr. Lies, clarifying her analysis and making clear that the second alternate solution sent to the Commission violated Commission regulations and that she would not actively participate in its implementation.

45. Ms. Ma also informed American Electric Power that the second, uncompleted alternate solution created by Mr. Hill and Mr. Kingseed would violate plant-specific design criterion relative to the reliability of systems vital to the functioning of engineered safety

features, if completed. In particular, Ms. Ma informed American Electric Power that the normal flow rate for the essential service water pumps would be reduced below proper limits. Without this essential service water, engineered safety features would not provide adequate core cooling to mitigate an accident, which could allow nuclear fuel in the reactor to melt and release radioactivity both inside and outside the containment building. The radiological consequences could be devastating and harmful to public health and safety.

46. Further, Ms. Ma consistently told American Electric Power that Mr. Hill and Mr. Kingseed had intentionally used incorrect inputs to manipulate large break LOCA safety analysis results such that they would fall below the peak cladding temperatures and acceptance criteria found in 10 C.F.R. 50.46. In other words, Ms. Ma told American Electric Power that she believed engineers within American Electric Power were cheating to obtain the results they desired and then misrepresented these results to the Commission.

47. Ms. Ma repeatedly told Messrs. Carlson, Ebright, Bellville, Hill, and Kingseed about these violations of the Commission regulations that would be present if the second alternate solution created by Messrs. Hill and Kingseed were adopted by the Best Estimate LOCA Analysis/Implementation project and eventually sent to the Commission. They acted not to fix these potentially disastrous problems, but to terminate Ms. Ma.

48. Instead of being rewarded for her nuclear safety findings, as had occurred under past leadership, Ms. Ma was terminated from American Electric Power for refusing to participate in any part of the second alternate solution created by Messrs. Hill and Kingseed that violated Commission regulations. According to her June 17, 2011 termination letter from Mr. Ebright to Ms. Ma, her termination resulted because, "Subsequently, after a decision was made selecting the issue resolution path, you stated that you would not actively participate in the implementation

of the selected solution path even though it was your responsibility to do so." The activities Ms. Ma participated in, as enumerated in her own termination letter from American Electric Power, are protected under 42 U.S.C. § 5851(a), and 10 C.F.R. 50.7. American Electric Power was aware of Ms. Ma's nuclear safety concerns, and knew that her refusal to sign off on the unsafe solution for large break LOCA safety analyses was motivated by those concerns.

49. Overall, Ms. Ma faced constant ridicule, harassment, and disrespect for multiple years prior to facing termination. She was criticized, sent to a counselor and psychologist, and disciplined multiple times for reporting Commission violations. Finally, fearing repercussions from the Commission, American Electric Power terminated her because she repeatedly reported illegal activities involving small break LOCA safety analyses and large break LOCA safety analyses and she repeatedly refused to partake in illegal activities involving large break LOCA safety analyses. She was unlawfully terminated in violation of 42 U.S.C. § 5851(a), and Commission regulation 10 C.F.R. 50.7.

## CAUSES OF ACTION

### COUNT I: Violation of the Energy Reorganization Act
### (against American Electric Power, Inc.)

50. Ms. Ma repeats and reasserts the allegations of paragraphs 1 through 49 as if fully restated herein.

51. Ms. Ma was subject to retaliation in violation of the Energy Reorganization Act, 42 U.S.C. § 5851(a), when American Electric Power terminated her employment because she notified American Electric Power of violations of federal laws and regulations and because she refused to engage in unlawful practices that she had identified to American Electric Power.

52. Section 211 of the Energy Reorganization Act, 42 U.S.C. § 5851(a), provides, "No employer may discharge any employee or otherwise discriminate against any employee with

respect to his compensation, terms, conditions, or privileges of employment because the employee (or person acting pursuant to a request of the employee)—(A) notified his employer of an alleged violation of this chapter or the Atomic Energy Act of 1954 (42 U.S.C. § 2011 *et seq*.); (B) refused to engage in any practice made unlawful by this chapter or the Atomic Energy Act of 1954, if the employee has identified the alleged illegality of the employer . . . ."

53. To establish a prima facie case of retaliation, a complainant must show that: 1) she engaged in some protected activity; 2) the employer was aware of the activity; 3) the employer took some adverse action against her, and; 4) the circumstances were sufficient to permit the inference that the protected activity was a contributing factor of the adverse action.

54. Ms. Ma engaged in protected activity under 42 U.S.C. § 5851(a)(1) by notifying American Electric Power of numerous violations of federal laws and regulations and by refusing to sign the June 16, 2011 letter to the Commission and actively participate in the implementation of the actions proposed in that letter.

55. American Electric Power was aware of the protected activity engaged in by Ms. Ma through repeated communications and correspondence with Ms. Ma and through condition reports and other documents that she prepared.

56. American Electric Power took adverse action against Ms. Ma by terminating her employment on June 17, 2011.

57. The termination of Ms. Ma's employment on June 17, 2011 occurred only one day after she refused to sign the June 16, 2011 letter to the Commission about large break LOCA safety analyses and sent Mr. Lies, one of the highest ranking officials at her plant, an email outlining her concerns.

58. At all material times, Ms. Ma performed at or above American Electric Power's

16

legitimate performance expectations.

59. As a direct and proximate result of the American Electric Power's conduct, Ms. Ma has suffered damages, including but not limited to, lost wages, lost benefits, loss of future employment commensurate with her experience and professional standing, loss of status and self-esteem, incidental damages, great expense, and pain and suffering in the form of emotional distress, anxiety, embarrassment and humiliation.

## REQUESTED RELIEF

**WHEREFORE** Plaintiff Mary Ma respectfully requests the entry of judgment in her favor and against Defendant American Electric Power as follows:

A. An award of damages for back pay, front pay, interest, and other equitable relief;

B. An award of compensatory damages in an amount to be proven at trial;

C. An award to Plaintiff for reasonable attorneys' fees and costs; and

D. All other relief this Court deems just.

### COUNT II:  Wrongful Discharge
### (against American Electric Power)

60. Ms. Ma repeats and reasserts the allegations of paragraphs 1 through 49 as if fully restated herein.

61. By refusing to sign the June 16, 2011 letter to the Commission and actively participate in the implementation of the actions proposed in that letter, Ms. Ma refused to violate the law in the course of her employment.

62. Ms. Ma's refusal to violate the law was one of the reasons that American Electric Power terminated Ms. Ma's employment.

63. By terminating Ms. Ma's employment for refusing to violate the law, American Electric Power acted with malice and in violation of public policy.

17

64.     As a result of American Electric Power's termination of Ms. Ma's employment, Ms. Ma suffered damages.

**REQUESTED RELIEF**

**WHEREFORE** Plaintiff Mary Ma respectfully requests the entry of judgment in her favor and against Defendant American Electric Power as follows:

A.     An award of compensatory damages in an amount to be proven at trial;

B.     Punitive and exemplary damages;

C.     All other relief this Court deems just.

### COUNT III:  Tortious Interference with Business Relations
### (against Michael H. Carlson and Randy F. Ebright)

65.     Ms. Ma repeats and reasserts the allegations of paragraphs 1 through 49 as if fully restated herein.

66.     Ms. Ma's employment with American Electric Power was a valid business relationship for which she had a reasonable expectancy would continue.

67.     Mr. Ebright and Mr. Carlson were aware of Ms. Ma's employment with American Electric Power, and acted with malice when they intentionally and unjustifiably induced American Electric Power to terminate Ms. Ma's employment.

68.     Mr. Ebright and Mr. Carlson acted in furtherance of their personal interests and against the interests of American Electric Power when they intentionally interfered with Ms. Ma's business relations with American Electric Power.

69.     As a result of Mr. Ebright's and Mr. Carlson's unlawful interference, Ms. Ma suffered damages.

**REQUESTED RELIEF**

**WHEREFORE** Plaintiff Mary Ma respectfully requests the entry of judgment in her

favor and against Defendants Michael H. Carlson and Randy F. Ebright as follows:

    A.    An award of compensatory damages in an amount to be proven at trial;

    B.    Punitive and exemplary damages;

    C.    All other relief this Court deems just.

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

**Dated:**  January 25, 2013       **MARY MA**

/s/ Ruth I. Major
_____
By:  One of Her Attorneys

Ruth I. Major (ARDC No. 6205049)
The Law Offices of Ruth I. Major, PC
30 W. Monroe, Suite 1650
Chicago, IL 60603
Tel:  (312) 893-7544
Fax:  (312) 698-9867
Email: rmajor@major-law.com