UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARY MA,

          Plaintiff,

                                     CASE NO. 1:13-cv-0089

v.

                                     HON. ROBERT J. JONKER

AMERICAN ELECTRIC POWER, INC.,

          Defendant.
_____/

## OPINION

This is a dispute between Plaintiff Mary Ma and Defendant American Electric Power ("AEP") concerning Ma's terminated employment from AEP. Ma asserts that AEP terminated her employment as retaliation for her safety reports and or other protected activity under the Energy Reorganization Act. Defendant AEP says the termination had nothing to do with protected activity, but rather with Ma's inability to work constructively with a team of engineers to implement management's chosen solution to a disputed technical issue. The parties presented evidence and argued the merits of their positions at a bench trial beginning on November 4, 2014, and ending on November 14, 2014. At the close of the bench trial, the Court took the matter under advisement. The opinion constitutes the Court's findings of facts and conclusions of law under Federal Rule of Civil Procedure 52.

## I. BACKGROUND

Ma worked as an engineer, and later as a supervisor, for AEP from 2000 until her discharge on June 11, 2011. AEP is an entity licensed by the Nuclear Regulatory Commission

that operates the Cook Power Plant in Bridgman, Michigan, where Ma worked.  The Nuclear Regulatory Commission is the federal entity which oversees licensees such as AEP.  AEP is required by federal law to comply with various Nuclear Regulatory Commission Policy Statements concerning workplace safety and protocol at the Cook Power Plant.

Maintaining a safe workplace environment at AEP is not only a requirement of regulations, but also a standard of practice and basic common sense.  Accordingly, AEP offers various internal mechanisms designed to enforce compliance.  AEP has personnel that focus on human performance and industrial safety who hold daily meetings that involve discussion of safety at the plant. (R. 211, Tr. Vol. V at 900, PageID # 4902.)  An employee who is concerned about safety can raise a concern with her immediate supervisor, as well as any other supervisor or manager on the site.  An employee also can raise a safety concern anonymously through AEP's internal Employee Concerns Program.  Moreover, AEP has a Corrective Action Program, which relies on a Condition Report process in which employees can anonymously file safety reports, identifying what they see as human errors and where the errors occur.  AEP's Condition Process is intended to and does promote reports—indeed, some 9,000 Condition Reports are submitted annually so that AEP can document potentially adverse conditions.  In addition, any employee can address a safety concern through external channels, by filing a report with the Nuclear Regulatory Commission.  In fact, the NRC has two full-time resident inspectors with offices physically present at the plant site.

AEP's senior management were unanimous in their praise of AEP's safety culture. Engineering Director Randy Ebright described the safety culture of AEP as a "self-improving

culture and learning organization" where the engineers are "constantly striving to learn, to improve, and to get better."  Director Ebright testified that "pointing out or identifying gaps in either knowledge or performance are things that we [engineers] can take action on to strengthen the organization."  (R. 211, Tr. Vol. V at 856, PageID # 4858.)  Director Ebright further testified that it was "absolutely" okay when co-workers pointed out other employee's mistakes in condition reports.  (R. 211, Tr. Vol. V at 856, PageID # 4858.)  Vice President Mike Carlson testified that "there's a recognition that we're all human, mistakes get made, we've got processes in place to correct them."  (R. 211, Tr. Vol. V at 901, PageID # 4903.)

That said, some AEP employees depicted the safety culture at AEP differently.  Ma, for her part, believed that AEP was a place that was hostile to employees such as herself who raised safety issues.  Engineer Bill Mammoser, Ma's husband, for a time worked at AEP, and he agreed with his wife Ma's view of AEP's safety culture.  Some of Ma's direct reports, such as Engineer Andy Hawk, also tended to view things in a manner similar to Ma.  In particular, Engineer Mammoser testified that he had refused to work on projects that in his view would have been used to advance what he saw as a solution that violated the Nuclear Regulatory Commission's regulations.[1]  Notably, despite Engineer Mammoser's occasional refusal to participate in solutions on safety grounds, witnesses from AEP's human resources department indicated that no one at AEP reported that Engineer Mammoser was insubordinate.   Nor did AEP take any

---

[1] The Court notes that a dispute or disagreement over the technical interpretation or application of an NRC regulation is not necessarily the same thing as a concern over safety.  Not all technical legal disputes implicate safety.  But for purposes of this decision, the Court treats Mammoser's issues as at least safety related.

adverse employment action against him.  Similarly, there were no reports that Engineer Hawk was insubordinate for refusing to participate in a solution.  (R. 210, Tr. Vol. IV at 624, PageID # 4607.)  Ultimately, the Court is satisfied that while personal feathers could and did get ruffled due to engineers disagreeing on the best approach to a problem, AEP's culture, policies, and practices all point to the open and orderly processing of safety reports.

During Ma's time as an employee at AEP, her performance was mixed.  On the one hand, Ma was a talented engineer who received positive performance reviews.  For example, in 2008 and 2009, AEP positively recognized Ma's contributions to the company.  In 2009, Ma received a highly-selective Key Contributor Award.  In January 2011, Ma's Manager, Yu Shen, submitted a positive review of Ma's performance.  And generally speaking, the AEP employees who worked under Ma testified that their experiences working with her were good ones.  For instance, one of Ma's direct reports, Engineer Hawk, praised Ma's acumen and spoke highly of her.  And Engineer James Hawley, who for a time worked in a particular engineering group with Ma, described her as a "hard worker" who was very "engaged in collegial discussions."  (R. 209, Tr. Vol. III at 409, PageID # 4337.)

On the other hand, Ma also had a series of interpersonal conflicts with other employees at AEP, particularly those who worked in groups other than her own.  These interpersonal conflicts went beyond just an uncomfortable relationship between colleagues, and seriously compromised the ability of some individuals to work together.  For instance, Ma and Supervisor Keith Steinmetz had interpersonal conflicts during Ma's time at AEP.  Ma expressed dissatisfaction with Supervisor Steinmetz's work product, stating that his "fundamentals" were

-4-

too "deficient" to warrant his continued participation in the resolution of an issue where he and Ma disagreed. Ma also did not get along with Engineer Greg Hill; their relationship was marked by several altercations indicating that the two had no personal affection for each other. Again, this animosity seriously undermined the ability of these individuals to work together, as Ma stated that Engineer Hill should "not be in the loop for current licensing basis matters," which, broadly speaking, relate to the overall design of the Cook Power Plant.

This created untenable circumstances that adversely affected the groups' ability to collaborate on error resolution, and in turn, the promise of safe working conditions at AEP. The interpersonal conflicts served to cultivate the impression among many of Ma's colleagues that she was not a team player. For instance, Chief Nuclear Counsel and Regulatory Affairs Manager Jim Petro testified that when it came to Ma, "everything in her view was an us and a them." (R. 210, Tr. Vol. IV at 682–83, PageID # 4665–66.) And HR Specialist Tiffany Rydwelski testified that she was concerned that "people wouldn't go to [Ma] for concerns because [Ma] would deflect or take criticism of someone challenging her work." (R. 210, Tr. Vol. IV at 622–23, PageID # 102–03.)

Ma's conflicted interpersonal interactions preceded the particular report at issue in this case. In a July 29, 2008 email, for example, Ma described her co-workers as "bullies." In a December 17, 2008 email, Ma stated that her work was "under attack" by her co-workers. In March 2009, Ma described some of her co-workers as "offensive" individuals, and characterized different groups at AEP as being engaged in "turf wars." And in April 13, 2010 email, Ma expressed resentment towards an individual who questioned her calculations on a project in a

Condition Report.  Ma wrote that the anonymous individual's analysis amounted to "heaping piles of nonsense," that the individual was "ignorant and mean," and that the "fight is far from over."  In fact, the Court observes that interpersonal issues concerning Ma dated all the way back to 2003, and that the frequency of Ma's incidents concerning interpersonal conflicts increased in the time leading up to her termination.  The interpersonal conflicts occurred often enough, over a sustained period of time and with a similar enough pattern for the Court to conclude that Ma is the common denominator of the troubled relationship, and the root source of the inability to forge constructive working relationships amidst interpersonal conflict.

In March 2010, Engineer Hill and Supervisor Steinmetz had raised a safety concern relating to Ma.  They believed that Ma and her group may have engaged in misconduct.  In particular, they believed that Ma had intentionally withheld information regarding an evaluation for a fuel reload project.  Supervisor Steinmetz reported his safety concern to one of AEP's managers.  The manager did not take action.  Director Ebright also investigated the matter, and determined that there was no evidence to support the contention that Ma had improperly withheld information.

In May 2010, Ma raised a safety concern by filing a Condition Report.  In the Condition Report, Ma notified AEP's high-level management that some of her fellow engineers may have intentionally withheld information from the Nuclear Regulatory Commission.  Specifically, Ma indicated that these engineers were allegedly aware of certain errors concerning a nuclear safety analysis but failed to notify the Nuclear Regulatory Commission of those errors, which, if true, would constitute a violation of Nuclear Regulatory Commission regulations.  In the report, Ma

specifically listed the names of those who she believed were in the wrong, including Engineer Hill.

The accusations between the individuals continued, and the conflict continued to escalate during the summer and fall of 2010. In July 2010, Supervisor Steinmetz raised another safety concern through AEP's Employee Concerns Program, which raised the possibility that Ma was an unethical employee. In October 2010, Ma raised another safety concern through AEP's Employee Concerns program, claiming that Supervisor Steinmetz had inappropriately yelled at her as retaliation for her having written the May 2010 Condition Report. Tensions continued to rise, to a point where the employees were loath to even speak to one another. In the backdrop, some leadership changes took effect at AEP. In particular, in June 2010, Vice President Carlson and Director Ebright had taken over AEP's increasingly-fractured engineering organization.

On October 15, 2010, Vice President Carlson, Director Ebright, and HR Specialist Tiffany Rydwelski met with Ma. During the meeting, Ma discussed Engineer Hill's and Supervisor Steinmetz's inappropriate conduct and hostility towards her. Ma expressed that she felt that AEP had not properly dealt with this situation. From there, on October 22, 2010, Vice President Carlson met with Engineer Hill. Engineer Hill discussed what he felt was Ma's inappropriate and hostile conduct. He expressed that he felt that AEP had not properly dealt with this situation. According to Vice President Carlson, this series of meetings confirmed to him that the work environment at the Cook Power Plant required immediate improvement.

On November 2, 2010, Ma met with HR Specialist Rydwelski, Vice President Carlson, Supervisor Yu Shen, Manager Mickey Bellville, Engineer Hill, and Supervisor Steinmetz.

According to Vice President Carlson, he attended the meeting with the goal of making his expectation known to everyone that all sides of the interpersonal conflict needed to exhibit professionalism going forward. He stressed the need for each side to effectively communicate with each other and to treat each other with respect, and to put past feelings of resentment or anger behind them for the sake of the group. HR Specialist Rydwelski also testified that she raised her concerns about the interpersonal issues with Engineer Hill, Supervisor Steinmetz, and Ma, and stressed the need for everyone to engage in professional behavior.

Later that same day, Ma sent an email to her Manager, Yu Shen, with several others copied, including HR Specialist Rydwelski, in which Ma commented that she heard Engineer Hill was "smearing her reputation." HR Specialist Rydwelski testified that after reading the email, she believed Ma was continuing "to go down the behavioral path of, you know, us/them, win/lose, Greg Hill. It's not the cohesive collective teamwork we would like to see in an email." (R. 210, Tr. Vol. IV at 618–19, PageID # 4601–02.) Vice President Carlson felt that the tenor of Ma's email violated his direction. As a result, the following day, Vice President Carlson again met with Ma, and further warned her that continued noncompliance with his expectations would lead to discipline.

Despite the meetings, AEP senior management continued to feel that Ma was failing to act as a team player and therefore violating Vice President Carlson's directions. During December 2010, Ma was involved in additional interpersonal conflicts with other AEP employees, namely, ones concerning whether it was appropriate for AEP employees to call Ma over the weekend; these conflicts involved more emails sent by Ma that AEP's management

found objectionable.  In January 2011, Ma received a letter indicating that AEP's management believed that her workplace communications were unprofessional.  The issue raised in the letter culminated in a meeting later that month.

On January 28, 2011, Director Ebright and HR Specialist Rydelwski again met with Ma to address the ongoing interpersonal problems between her and others, including Engineer Hill. HR Specialist Rydwelski testified that during the meeting, Ma described a hypothetical situation in which "Greg Hill kills my baby."  HR Specialist Rydwelski testified that because Ma made that strange comment, she referred Ma to the AEP's Employee Assistance Program, which was designed to assist employees who had professional or interpersonal shortcomings and enable them to correct their behavior.  As part of the Employee Assistance Program, Ma attended counseling sessions focused on developing her interpersonal skills.

In Feburary 2011, the Employee Assistance Program required that Ma take a period of leave from AEP.  Following this period of leave, Ma returned to work at AEP.  On February 10, 2011, Director Ebright and HR Specialist Rydelwski again met with Ma.  During this meeting, they again stressed the need for Ma to comply with the expectations set at earlier meetings. HR Specialist Rydwelski testified that for a period after Ma returned, she did not hear any negative reports about Ma's behavior.  (R. 210, Tr. Vol. IV at 623, PageID # 4606.)  However, HR Specialist Rydwelski also testified that when she did discuss Ma's performance with others at a later time, her conclusion was that Ma had not corrected her behavior in the time following her experience in the Employee Assistance Program and her period of leave.  (R. 210, Tr. Vol. IV at 623, PageID # 4606.)

Around this time, there were some personnel changes at AEP. Manager Shen, the engineer to whom Ma reported, left AEP to take a job in the Middle East. This meant that Ma began reporting to Manager Bellville. Manager Bellville now reported to Director Ebright. And Manager Ebright now reported to Vice President Carlson.

Also around this time, AEP tasked a group of engineers with finding a solution to certain "LOTIC2" errors concerning what the engineers termed a "LOCA" safety analysis. Ma, as well as her husband, was a member of this group. The engineers selected for the group were to identify the problem and offer various resolution proposals to solve the errors. This complicated nuclear-science issue involved many engineers over a period of several months. At first Ma led the group, but at some point, Manager Bellville, due to what he believed were flaws in Ma's leadership style, transferred the leadership of the group to Engineer John Zwolinski.

The process of fleshing out the issues concerning the "LOTIC2" errors culminated in the Spring and early Summer of 2011. By her account, Ma offered three resolution proposals. Senior management began to coalesce around one resolution proposal, which several engineers referred to as the "relay failure" proposal. The "relay failure" proposal was not one that Ma had suggested. Ma had reservations about the "relay failure" proposal because she believed that it was unsafe and would violate Nuclear Regulatory Commission requirements, and she raised some variant of those concerns with the other members of the team. Despite Ma's reservations, on June 3, 2011, Vice President Carlson announced that AEP would implement the "relay failure" proposal.

-10-

The parties disagree on how best to categorize Ma's behavior as a member of that group, her reluctance to embrace the "relay failure" proposal, and her eventual refusal to participate in the solution. Ma described her conduct as repeatedly raising her concern that the "relay failure" proposal was illegal or unsafe. In contrast, many others—including Plant Manager Shane Lies, Vice President Carlson, and the eventual leader of the group, Engineer Zwolinski—described Ma's conduct as being disagreeable and contrarian, and denied that Ma ever raised concerns of illegality. To be sure, Chief Nuclear Counsel and Regulatory Affairs Manager James Petro testified that if an AEP employee genuinely believed that a proposed solution was potentially illegal, AEP would accord the employee the right to not work on it. But AEP management, namely Vice President Carlson, viewed Ma's actions as rooted not in safety concerns, but insubordination. On June 13, 2011, several AEP employees—including Plant Manager Lies, Vice President Carlson, Director Ebright, and Chief Nuclear Counsel Petro—met to discuss, and ultimately agreed with, Vice President Carlson's recommendation that Ma be fired from AEP.

On June 17, 2011, AEP terminated Ma's employment. Chief Nuclear Counsel Petro testified that Ma was terminated for a combination of insubordination and unresolved personal relationship issues within the workplace, which in his view "culminated in the refusal to work." (R. 210, Tr. Vol. IV at 680, PageID # 4663.) Director Ebright testified that the altercation "led me to the conclusion that the things we had been coaching, counseling, demonstrating, you know, fostering with Mary, the information that we had provided and the written warning where we met with her when she returned from the time away from the facility, . . . she had not followed through on her commitment to rehabilitate her behavior, and that basically it was

-11-

destructive to our facility and consequential to our nuclear safety culture." (R. 211, Tr. Vol. V at 867–68, PageID # 4869–70.)   HR Specialist Rydwelski testified that "there was a recommendation of separation from the company because of her lack of working on a work product, which was a sign of continued behavior deficiency. . . . In my view there were behaviors that were exhibited by [Ma] that were not recoverable.  She didn't internalize them." (R. 210, Tr. Vol. IV at 102–03, PageID # 4605–06.)

After Ma's employment was terminated, she raised her concern about the "relay failure" proposal directly with the Nuclear Regulatory Commission.   In response to Ma's correspondence, the Nuclear Regulatory Commission conducted an investigation.  Ultimately, the Nuclear Regulatory Commission did not find sufficient evidence to support Ma's claim that the "relay failure" proposal violated federal standards.

Ma filed a timely complaint with the Secretary of Labor alleging that her discharge was unlawful under the Energy Reorganization Act, 42 U.S.C. § 5851.  When the Secretary of Labor did not issue a final decision in Ma's case within one year of her filing her timely complaint, Ma brought this action against AEP in the United States District Court for the Western District of Michigan, as she is entitled to do under 42 U.S.C. § 5851(b)(3)(D).

## II.  LEGAL STANDARD

The Energy Reorganization Act prohibits entities licensed by the Nuclear Regulatory Commission from retaliating against employees for reporting and pursuing nuclear safety concerns. *See* 42 U.S.C. § 5851(a). Under the statutory framework, a complainant bears the initial burden, and must demonstrate by a preponderance the elements of the prima facie case:

(1) that the complainant engaged in protected activity, (2) that an adverse employment action was taken, and (3) that the complainant's protected activity was a contributing factor in the adverse employment action. *See* 42 U.S.C. § 5851(b)(3)(C). Protected activity generally involves matters that relate to safety, and adverse employment actions include termination. *See id.* As to the causal nexus between the two, the contributing factor standard is forgiving. *See id.* The Sixth Circuit has described the standard as "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." *Consol. Rail Corp. v. U.S. Dep't of Labor*, 567 F. App'x 334, 338 (6th Cir. 2014).

If the complainant succeeds in setting forth a prima facie case, then the burden shifts to the employer, who "demonstrates, by clear and convincing evidence, that it would have taken the same unfavorable personnel action in the absence of such behavior." 42 U.S.C. § 5851(b)(3)(B). "For employers, this is a tough standard, and not by accident. Congress appears to have intended that companies in the nuclear industry face a difficult time defending themselves." *Indiana Mich. Power Co. v. U.S. Dep't of Labor*, 278 F. App'x 597, 603 (6th Cir. 2008) (quoting *Stone & Webster Eng. Corp. v. Herman,* 115 F.3d 1568, 1572 (11th Cir. 1997)).

### III.  DISCUSSION

#### A.  Ma's Burden: The Prima Facie Case

The first issue is whether Ma satisfied the first prong of the prima facie case, specifically, whether she engaged in protected activity when she raised concerns about what she observed at AEP by filing the May 2010 Condition Report or by stating that the "relay failure" proposal was a violation of Nuclear Regulatory Commission regulations. "To constitute protected activity

under the [Energy Reorganizaton Act,] 'an employee's acts must implicate safety definitively and specifically.'" *Ind. Mich. Power Co.*, 278 F. App'x at 603 (quoting *Am. Nuclear Res., Inc. v. U.S. Dep't of Labor*, 134 F.3d 1292, 1295 (6th Cir. 1998)).  Courts are to interpret the protected-activity prong "broadly."  *Am. Nuclear Res.*, 134 F. 3d at 1292.

On this record, the Court finds that Ma's filing of the May 2010 Condition Report and expressed opposition to the "relay failure" proposal satisfies this prong.  The filing of a safety report is exactly the sort of activity that the Energy Reorganization Act protects.  *See* 42 U.S.C.A. § 5851. And an employee raising a sincerely-held belief that a certain practice is unlawful is also protected by the Energy Reorganization Act.  *See id.* § 5851(a)(1)(B).

The Court's finding is well-supported by precedent.  The Sixth Circuit has held that an employee's complaint about excessive work hours at a nuclear power plant may constitute protected activity on the grounds that excessive work hours raise the "potential for fatigue, which directly impacts the safety of the nuclear reactor."  *Ind. Mich. Power Co.*, 278 F. App'x at 603. By contrast, an employee's complaint about his coworkers, which did not include an allegation that the employer was "violating nuclear laws or regulations[,] . . . ignoring safety procedures or assuming unacceptable risks" did not constitute protected activity.  *Am. Nuclear Res.*, 134 F.3d at 1296.  Certainly, Ma's actions relate to a "safety concern that was both concrete and continuing."  *Id.*  Accordingly, the Court finds by a preponderance of the evidence that Ma engaged in protected activity.

AEP does not contest that Ma's terminated employment constitutes an adverse action that satisfies the second prong of the prima facie case, so the Court proceeds to the third prong of the

-14-

prima facie case: whether Ma's protected activity contributed to the adverse employment action. The parties do not dispute that AEP knew of Ma's protected activity, and so the only question for this Court is whether Ma's protected activity was a contributing factor in, or affected in "any way," AEP's decision to terminate her employment. *See Consol. Rail Corp.*, 567 F. App'x at 338. To make this showing, Ma may rely solely on circumstantial evidence. *See Ind. Mich. Power Co.*, 278 F. App'x at 604.

The Court finds that Ma's protected activity was a contributing factor in AEP's decision to terminate Ma's employment.  The record contains positive performance evaluations that Ma received during her tenure at AEP that are relatively close in time to the termination of Ma's employment. *See Ind. Mich. Power Co.*, 278 F. App'x at 605 (discussing causality under the contributing-factor standard).  The record also contains evidence that some AEP employees displayed hostility to Ma.  *See Consol. Rail Corp. v. U.S. Dep't of Labor*, 567 F. App'x 334, 336–38 (6th Cir. 2014) (noting hostility towards the terminated employee in the context of the contributing-factor standard).  Moreover, AEP employees testified that they felt Ma did not submit the Condition Report in the manner that they believed was appropriate. *See id.* at 338 (finding that an employer's "flicking" safety reports across a table and his alleged request to stop submitting safety reports sufficient to support a factual finding that an employee's protected activity was a contributing factor in his termination). The Court finds that the record supports the inference that Ma's protected activity served as a contributing factor to AEP's decision to terminate her employment.

The Court finds by a preponderance of the evidence that Ma engaged in protected activity, that Ma suffered an adverse employment action, and that Ma's protected activity was a contributing factor to the adverse action.  Therefore, the Court concludes that Ma has satisfied the elements of the prima facie case.

### B. AEP's Burden: Clear and Convincing Evidence

The second issue is whether AEP has demonstrated by clear and convincing evidence that it would have terminated Ma's employment even had she not filed the May 2010 Condition Report or objected to the "relay failure" proposal.  *See* 42 U.S.C. § 5851(b)(3)(B).  In other words, did AEP terminate Ma's employment because of her protected activity, or because of her continued pattern of interpersonal and professional shortfalls?

The Court finds by clear and convincing evidence that AEP terminated Ma's employment not because of her protected activity, but because of the interpersonal challenges that were plainly evident during the entirety of Ma's tenure at AEP.  *See id.*  The Court is convinced that Ma's personal interpretation is heartfelt, but wrong.  *See Consol. Rail Corp.*, 567 F. App'x at 339 (noting that a fact-finder must reconcile conflicting accounts).  The Court finds that AEP was not trying to force her out in retaliation for filing safety complaints or objecting to the proposed solution.  Rather, they were terminating her because she was unable or unwilling to work collaboratively as part of a team; she wanted to be an island of righteousness in her own world. The record supports, and the Court concludes, that Ma did not effectively talk, collaborate, and otherwise work with many of her co-workers at the Cook Power Plant, and that it was this shortcoming that caused AEP to terminate her employment.  *See Am. Nuclear Res.*,134 F.3d at

-16-

1295 (observing that "an employer may terminate an employee who behaves inappropriately, even if that behavior relates to a legitimate safety concern").

The Court finds that the evidence points overwhelmingly to a long, recurring conflict between Ma and others, particularly Engineer Hill. Several of Ma's colleagues characterized Ma as a person who was unwilling to collaborate with others on issue resolution, did not value others' input, and demeaned those who disagreed with her. *See Yadav v. L-3 Commc'ns Corp.*, 462 F. App'x 533, 537 (6th Cir. 2012) (holding that an employee's "condescending tone" and "inappropriate comments" supported a fact-finder's determination that an employee was terminated not because of protected activity, but because of unprofessional conduct). Ma's "doesn't work well with others" problem was present from the start of her time at AEP until the end, and is evident from ample record evidence, including excerpts from Ma's emails and incidents of inappropriate behavior that predate her filing of the May 2010 Condition Report. *See Hoffman v. Solis*, 636 F.3d 262, 269 (6th Cir. 2011) (holding that an employer's reliance on evidence that predated the employee's protected activity undercut an employee's retaliation claim). When Ma's boss, Supervisor Shen, left AEP, Ma lost the individual who served as her protector and buffer, and the conflict between Ma and Engineer Hill, as well as other AEP employees, became front, center, and unavoidable. The Court makes the inference that this problem was muted at times during her tenure at AEP because her previous boss, Supervisor Shen, ran interference for her.

The interpersonal conflicts effectively placed Ma and her group in a "silo," where they were unable to function with the other groups. The "silo" problem that AEP experienced was

real, and even illustrated by her case. Ma's whole case rests on her own interpretation of events, and on words that she puts into the mouth of her former boss, Supervisor Shen, as well as the mouths of others who did not testify directly. Ma's own testimony presented exactly what her detractors said—she was unable or unwilling to see or allow for potential error on her side of the conflict. This was the most telling question and answer during the case. During Ma's testimony, she was frozen initially, then dodged a bit, and finally settled on "need context," which became a repeated refuge for her. Again, this illustrates exactly what led to her trouble at the company. The recent decision of the Nuclear Regulatory Commission is certainly not helpful either—the decision shows that her solution to the technical problem was flawed and that her thoughts about the "relay failure" proposal were misplaced. And yet there was never really a moment during Ma's testimony where she seemed to recognize any flaws in her own judgment, or even the potential for such flaws.

Ma's approach created an untenable situation for AEP's senior management, as the different groups of engineers could not work together to develop solutions to safety problems. In fact, Ma's inability to talk and collaborate with other workers is in and of itself a safety issue, in light of the consideration that the workers in question are all employed at a nuclear power plant. AEP's Senior Management had not only the right, but also the responsibility, to put this conflict to an end. *See Am. Nuclear Res.*, 134 F.3d at 1295 (discussing when an employer may terminate an employee without violating federal whistle-blower laws). To resolve this problem, Vice President Carlson served notice of his expectations not only to Ma, but also to those on the other side of the conflict. Vice President Carlson testified that Ma did not respond to the notice

of his expectations in the manner that he felt was necessary for the AEP workplace.  The Court finds this testimony credible.  The Court believes Vice President Carlson's testimony that it was Ma's failure to respond to his expectations in an appropriate manner that led to her firing.  The Court also believes Vice President Carlson's testimony that even at that juncture, he was reluctant to do so because Ma was a skilled engineer and good engineers are difficult to come by.  Notably, Vice President Carlson's testimony is corroborated by Ma's ability to get another job so promptly with as good, or better, pay.

Ma's alternate version of events requires the inference that there was some sort of conspiracy at AEP, and that her detractors long-intended to see her fired from the company.  The Court concludes that this inference is not supported by the evidence.  The fact that other AEP employees made safety complaints, in the form of Condition Reports or otherwise, and yet seemingly escaped the scrutiny of AEP, undercuts Ma's case.  Ma's husband, Engineer Mammoser, testified in court that he at times refused to participate in solutions that he felt were illegal, but also testified that AEP never targeted him for this behavior.  HR Specialist Rydwelski testified that neither Engineer Mammoser nor any direct report of Ma's, such as Engineer Hawk, were disciplined for raising safety issues.  Why, then, would AEP target and discipline only Ma for doing so?  Ma's view of the case does not add up.

Case law supports this Court's assessment of the evidence and its ultimate determination. In *Consolidated Rail Corp. v. United States Department of Labor*, an employee claimed that his employer, a railroad company, terminated his employment because he filed safety reports; his employer claimed that it terminated his employment because of his inappropriate conduct at

work.  But the record in that case showed that many employees engaged in inappropriate conduct without being disciplined, while the one employee who filed safety reports was disciplined—ultimately, the fact-finder found in favor of the employee.  *Id.* at 339.  The record in that case was in fact suggestive of an employer who was conspiring against or "out to get" a certain employee, as the one factor that was unique to the employee—his filing safety reports—served as the catalyst of his firing.

The record in Ma's case, by contrast, presents the inverse factual situation and therefore compels the opposite conclusion.  In Ma's case, many AEP employees file safety reports—this inference is clear in light of the 9,000 reports filed annually.  Some AEP employees, such as Engineer Mammoser, refuse to participate in solutions that they find objectionable on safety grounds.  But the record does not reveal *any* disciplinary action taken against any of the other employees who filed safety reports, refused to participate in solutions, or otherwise engaged in protected activity, simply for that reason.  Instead, only Ma, who had a long history of interpersonal and performance issues at AEP, was the subject of disciplinary action.  The obvious inference here is that the factor unique to Ma—her poor interpersonal skills—served as the catalyst of her firing.

Other cases involving fact patterns similar to Ma's also arrive at the same conclusion.  *Riddle v. First Tennessee Bank, National Association*, 497 F. App'x 588, 596 (6th Cir. 2012), involved alleged wrongful termination under another whistle-blower statute similar to the one at issue here.  In that case, an employer met its clear-and-convincing-evidence burden in part by noting that the discharged employee had received a written warning that referenced termination,

and despite this warning, the employee continued to exhibit poor judgment and demonstrated unsatisfactory performance.  This parallels how Ma continued to engage in combative behaviors even after being warned by Vice President Carlson at their meeting, and how that continued behavior led to her termination.  *See id.*

Ma's case is also similar to *Yadav v. L-3 Communications Corp*; in that case, the fact-finder found that the employer met its clear-and-convincing burden based on the employee's unprofessional conduct, as AEP has done here.  *See* 462 F. App'x at 537.  Many of the employee's behaviors in that case are similar to the ones Ma exhibited, including the inability as a leader to create a positive work environment across different groups, a lack of communication and collaboration with others, strong tendencies to offer accusations and characterize situations without actively creating resolutions, and condescending comments. *See id.* at 535–36.  These sorts of behaviors are toxic to any work environment, especially a nuclear power plant, where sudden and fluid communication between colleagues is critical.

Ma's remaining arguments to the contrary fail.  Ma points to the recognition that she received from AEP as conclusive evidence that she did not have interpersonal problems at work, and that her protected activity must have served as the impetus for her firing.  Her implication is incorrect.  Recognition for technical accomplishments does not disprove the fact that Ma had a history of interpersonal problems at AEP, and it does not establish that the views of several of her colleagues concerning her professional demeanor were wrong.   Rather, these accomplishments reinforce a picture of an employee who had formidable engineering skills, but corrosive interpersonal skills.  Ma also at times suggests that Supervisor Shen might have offered

evidence that she did not have interpersonal problems, but she did not call him to testify. The Court declines the invitation to make this inference.

Finally, both parties suggested in their post-trial briefing that the outcome of this case might have been affected had the Court afforded each party additional time. *See, e.g.*, Pl. Post-Trial Br. at 5; Def. Post-Trial Br. at 8. This is incorrect. More time and proofs would not have changed the outcome of this case. The paper record is enormous already. And each side can find things on the record to bolster its case and detract from the other side. The key and pivotal issue is this Court's assessment of how the record hangs together most convincingly after listening to the witnesses. And this Court has determined that AEP has shown, by clear and convincing evidence, that it terminated Ma's employment due to her longstanding interpersonal issues. Accordingly, the Court finds that AEP cannot be held liable under the Energy Reorganization Act. *See* 42 U.S.C. § 5851.

## IV.  CONCLUSION

For the reasons set forth above, the Court finds that American Electric Power did not violate 42 U.S.C. § 5851. Judgment will enter accordingly in favor of the Defendant, American Electric Power, and against the Plaintiff, Mary Ma.

Dated:    August 18, 2015              /s/ Robert J. Jonker
                                       ROBERT J. JONKER
                                       CHIEF UNITED STATES DISTRICT JUDGE